1          MGD

2    WO

3

4

5

6                      **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

8

9    Thomas Lamont Tillard,                  No.  CV 20-00922-PHX-JAT (DMF)

10                        Plaintiff,

11   v.                                       **ORDER**

12   M. Strawser, et al.,

13                        Defendants.

14

15        Plaintiff Thomas Lamont Tillard, who was previously incarcerated in the Pinal

16   County Adult Detention Facility, filed this pro se civil rights action pursuant to 42 U.S.C.

17   § 1983 against Pinal County Sheriff's Office (PCSO) Deputies Megan Strawser and Jose

18   Garibay.  Defendants move for summary judgment.  (Doc. 62.)  Plaintiff was informed of

19   his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th

20   Cir. 1998) (en banc) (Doc. 64), and he opposes the Motion.  (Doc. 65.)

21   **I.    Background**

22        Plaintiff alleges the following in his Complaint.   On May 11, 2019, Defendant

23   Strawser arrested and handcuffed Plaintiff while he was on the floor, and then pulled on

24   the handcuffs to get him to his feet, which caused Plaintiff to jackknife into Strawser. (Doc.

25   1 at 4.)[1]  Afterwards, Plaintiff was taken to a PCSO substation, and while he was seated in

26   a holding cell, Defendant Garibay grabbed the handcuffs, pulling Plaintiff's arms upward

27   _____

28        [1] The citation refers to the document and page number generated by the Court's
     Case Management/Electronic Case Filing system.

behind Plaintiff and then "jammed his right knee into Plaintiff's side ribs & stomach causing Plaintiff severe pain and breathing difficulty." (*Id*. at 5.)  Plaintiff cried out in pain, pleading with Garibay to "please stop, you're hurting me." (*Id*.)  Plaintiff then lost consciousness (*Id*.)  Defendants' actions caused kidney failure/malfunction, seven days hospitalization, massive edema and three weeks of swelling to the left hand and arm, and abrasions and contusions to the left side of Plaintiff's face. (*Id*. at 3, 6.)

Upon screening, the Court determined that Plaintiff stated a Fourth Amendment excessive force claim in Count One against Defendants Strawser and Garibay and directed them to answer the claim. (Doc. 5.)  The Court dismissed the remaining claims and Defendants. (*Id.*)

**II.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial."

*Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.   Relevant Facts**

On May 11, 2019, Plaintiff smoked four blunts of marijuana and purchased methamphetamine. (Doc. 63 (Defs.' Statement of Facts) ¶ 1.) Afterwards, Plaintiff and his mother had a dispute and Plaintiff grabbed and held his mother before taking her to the ground. (*Id.* ¶¶ 2-3.) After Plaintiff's mother got away, she called the police and reported that Plaintiff wrestled with her for what felt like 30 minutes. (*Id.* ¶ 5.) Plaintiff remained on the kitchen floor. (*Id.* ¶ 7.) Plaintiff was asked at his deposition if, at this time, "because of these four blunts that [he was] already kind of in an altered mental status?," and Plaintiff answered, "You could say that, yes." (Doc. 63-1 at 11 (Pl. Dep. at 35:2-5).) Plaintiff states in his Declaration that he was "present and alert throughout all that took place on May 11, 2019, until I lost consciousness" later at the PCSO substation. (Doc. 66-1 at 36 and 39 ¶¶ 2, 24.)

About 11 minutes after Plaintiff's mother called for help, Defendant Strawser arrived on scene, and Plaintiff's mother informed Strawser that Plaintiff was possibly on drugs. (Doc. 63 ¶¶ 8-9.) Deputy Waggoner arrived, and Waggoner and Strawser entered the house where Plaintiff was still lying face down in the kitchen floor. (*Id.* ¶¶ 10-11.) Strawser quickly handcuffed Plaintiff behind his back while he was lying on his stomach. (Doc. 66-1 at 37 ¶ 7.) Plaintiff was "grumbling, sweating profusely, and had white foam on the corner of his mouth." (Doc. 63 ¶ 12.) Plaintiff objects to this description and says he admitted to having cotton mouth and was possibly sweating. (Doc. 66 ¶ 12.) Because of Plaintiff's visible condition, Deputy Strawser radioed for Emergency Medical Services

(EMS) to come evaluate Plaintiff.  (Doc. 63 ¶ 13.)  Plaintiff was placed under arrest.  (*Id.* ¶ 14.)  Following a search incident to the arrest, Deputy Strawser discovered a blue medical glove containing methamphetamine, two plastic containers listed as medical marijuana, and a container with a marijuana blunt.  (*Id.* ¶ 15.)

Deputy Strawser grabbed the handcuffs' link chain, pulling him "somewhat off the ground," and Plaintiff "jacknifed" into Strawser's leg before getting to his feet.  (Doc. 66 ¶ 18; Doc. 66-1 at 37 ¶ 10.)  Plaintiff gave no indication or complaint at the time Deputy Strawser assisted him to his feet that Strawser's actions caused him any pain.[2]  (Doc. 63 ¶ 19.)  Plaintiff is six foot three inches tall and weighed 195 pounds; Deputy Strawser is five foot five inches tall and weighed approximately 125 pounds.  (Doc. 63 ¶¶ 21-22.)  Strawser and another deputy escorted Plaintiff outside and put Plaintiff inside a vehicle.  (Doc. 66-1 at 37 ¶ 11.)

EMS from Rural/Metro Fire Department arrived.  (Doc. 63 ¶ 26.)  The parties dispute whether the EMS evaluated Plaintiff.  Plaintiff contends he "was not evaluated at any point during the entire arrest of May 11th 2019 by Medical Servs," and that the fire vehicle pulled alongside the patrol car Plaintiff was in, fire personnel "exited the fire truck and went inside the Plaintiff residence," and a few minutes later, Plaintiff was transported to the PCSO substation.  (Doc. 66 ¶ 26; Doc. 66-1 at 37 ¶¶ 12-13.)  Plaintiff was already in the back of the police car when the fire department arrived and claims that "[n]ever, not once, did they look at me, talk to me, took any vitals of me or anything.  Walked straight to the house, and then the officer got in the car and we left [for] the substation on Ironwood."  (Doc. 63-1 at 30 (Pl. Dep. at 57:19-24).)  A Rural/Metro Patient Care Report for May 11, 2019 indicates that when Fire Paramedics arrived at the scene at 14:48:00, Plaintiff was cuffed inside a patrol car, and Plaintiff agreed to an evaluation.  (Doc. 63-1 at 50.)  The report states that Plaintiff was alert and oriented x 4, his extremities were "fully intact, purposeful movement," Plaintiff was answering questions appropriately, and the

---

[2]  Although Plaintiff says he objects to Defendants' paragraph 19, he does not say he disputes that he gave no indication he was in pain, and only says he later asked someone to loosen his handcuffs at the PCSO substation.  (Doc. 66 ¶ 19.)

- 4 -

primary impression was "Toxicological—Illegal Drugs." (*Id*. at 50-51.)  The report says Plaintiff was advised to go the ER for evaluation, but he refused "to go to ER via ambo." (*Id*. at 50.)   Defendants contend the report did not identify any issues, including to Plaintiff's extremities, but Plaintiff says paramedics did not evaluate him.  (Doc. 63 ¶ 29; Doc. 66 ¶¶ 28-29.)

After Plaintiff was taken to the PCSO, his booking paperwork was completed, and he was charged with assault/domestic violence, disorderly conduct/domestic violence, possession of dangerous drugs, and possession of marijuana.  (Doc. 63 ¶¶ 32-33.)  Plaintiff was taken to the holding cell at the substation where he vomited several times and requested water.  (*Id*. ¶¶ 34, 36.)  Defendants contend the deputies provided Plaintiff with water and monitored him, but Plaintiff asserts no water was given to him at any time.  (*Id*. ¶ 37; Doc. 66 ¶ 36.)  Plaintiff repeatedly asked the deputies for water and to loosen the handcuffs, but none of the four deputies responded, and Plaintiff was ignored.  (Doc. 66-1 at 38 ¶¶ 15-16.)  Plaintiff sat in the cell listening to the deputies laugh about "how much they hate methamphetamine and the Plaintiff being black in their town."  (*Id*. ¶ 17.)  Plaintiff began to worry about the deputies' intentions.  (*Id*. ¶ 18.)

About 20 minutes after Plaintiff entered the holding cell, Defendant Garibay appeared at the cell, and Plaintiff asked again for water and to loosen the handcuffs, but neither Garibay nor the others responded.  (*Id*. ¶ 19.)  Garibay walked into the cell and said, "domestic violence, huh," grabbed the handcuffs' chain link, "pulling Plaintiff's arms high up into the air, [and] jamming with speed & tremendous force knee-ing the Plaintiff on his right side postero lateral lower torso."  (*Id*. ¶ 20.)  Plaintiff went into a seated folded position, his face was pressed into the cinder block wall, and he was in severe pain and could barely breathe.  (*Id*. ¶¶ 21-22.)  Plaintiff cried out, "please stop & you['re] hurting me," and then lost consciousness.  (*Id*. ¶¶ 23-24.)  Defendant Garibay denies this happened and states that he only assisted other deputies in escorting Plaintiff to the patrol vehicle for Sergeant Cruz to transport Plaintiff to the Pinal County Jail.  (Doc. 63 ¶¶ 43-44.)  Plaintiff

does not recall anything after losing consciousness until waking up in Banner Ironwood Hospital the following day.  (Doc. 63 ¶ 45.)

Plaintiff was refused at the Pinal County Jail due to his injuries, and he was taken to Horizon Services where he became extremely ill.  (Doc. 63 ¶ 47; Doc. 66-1 at 40 ¶ 32.)  American Medical Response (AMR) Pinal County responded to Horizon Services at approximately 6:15 p.m.; AMR's report notes a primary impression of illegal drugs with a secondary impression of altered mentation, Plaintiff's chief complaint was ALOC (altered level of consciousness), and Plaintiff was not oriented to time or place when AMR arrived.  (Doc. 63 ¶¶ 48-52.)  Plaintiff had a physical assessment, and his extremities were positive and unremarkable and "fully intact [with] purposeful movement."[3]  (*Id.* ¶ 51.)

AMR took Plaintiff to Banner Ironwood Medical Center Emergency Room, where Plaintiff was admitted.  (*Id.* ¶¶ 53-54.)  Plaintiff was assessed by ER Physician Dr. Schenk, who noted that Plaintiff reported "generalized abdominal pain.  Initially denied any illegal substance, however when confronted with the fact that he was found to have methamphetamine on him, admitted to methamphetamine use."  (*Id.* ¶¶ 55-56.)  At intake, Plaintiff "present[ed] with altered mental status," and Plaintiff "ha[d] no recollection of how he got here."  (*Id.* ¶ 57.)  At 11:59 p.m.—more than 9 hours after Plaintiff's arrest—Dr. Schenk reexamined Plaintiff and noted Plaintiff "has now developed some swelling to the left forearm."  (*Id.* ¶ 58.)  Defendant's medical expert noted in his expert report that Plaintiff's swollen arm was not present on his previous exam.  (*Id.* ¶ 59.)  Dr. Schenk documented that Plaintiff's lab work was "consistent with acute rhabdomyolysis with some

---

[3] Plaintiff "objects" to all of Defendants' facts about the transport to Horizon Services and the AMR report, asserting that Defendants are "covering up the assault that took place at the substation," but Plaintiff also asserts in the same "objections" that he was unconscious at the time.  (*See* Doc. 66 ¶¶ 47-52.)  Plaintiff does not cite any evidence to refute Defendants' facts, which are supported by the sworn testimony of the Defendant Officers based on their personal knowledge and the AMR report, all of which is competent evidence.  *See* Fed. R. Civ. P. 56(c)(4) (sworn statement used to support summary judgment motion must be made on personal knowledge).  Neither Plaintiff's unconsciousness during this time nor his speculation that Defendants were "covering up" the alleged assault are sufficient to create a genuine issue of material fact regarding Defendants' version of events.

renal insufficiency."[4]  (Doc. 63 ¶ 60; Doc. 63-1 at 98.)  A urine sample taken around midnight showed Plaintiff as positive for methamphetamines and cannabinoids.  (Doc. 63 ¶ 61.)

Later, Dr. Naar later documented left arm swelling and assessed Plaintiff with "acute rhabdomyolysis with acute renal failure"; the plan was to admit Plaintiff for inpatient management and "Acute rhabdomyolysis: differential for etiology includes statin, methamphetamines."  (*Id.* ¶ 62; Doc. 63-1 at 83.)  Plaintiff's creatine kinase (CK) was elevated at 31,540.[5]  (Doc. 63 ¶ 63.)  The next morning, Dr. Suchak noted that Plaintiff had a CT scan of the left arm, which was negative, but did show superficial venous thrombosis in the left arm that did not need intervention.  (*Id.* ¶ 64; Doc. 63-1 at 94.)  Dr. Suchak's assessment included "severe rhabdomyolysis and concerns for recent ams [presumably, altered mental status] likely from amphetamine ingestion," acute renal failure likely secondary to the rhabdomyolysis, left arm swelling with negative CT and no signs of infection, and toxic encephalopathy.  (Doc. 63 ¶ 65; Doc. 63-1 at 91-92, 95.)

Plaintiff's treating physicians wanted him to remain in the hospital, receiving IV fluids, until his CK level dropped below 5,000.[6]  (Doc. 63 ¶ 67.)  On May 12, 2019, a CT of Plaintiff's left arm showed no fracture or dislocation "but did show an ill-defined nonspecific low-attenuation lesion from the lateral left pectoris muscle along the anterior aspect of the proximal biceps."  (Doc. 63-1 at 109.)  On May 16, 2019, Plaintiff received an ultrasound on his left arm, which showed a small segment superficial venous thrombosis

---

[4] Rhabdomyolysis is "[a]n acute, fulminating, potentially fatal disease of skeletal muscle that entails destruction of muscle, as evidenced by myoglobinemia and myoglobinuria."  Stedman's Medical Dictionary 781430.

[5] Plaintiff attributes the elevated CK to "blunt force trauma to the right postero lateral lower torso causing kidney failure," but he does not cite any evidence for this conclusion.  (*See* Doc. 66 ¶ 63.)

[6] Plaintiff objects to this statement, asserting that he had "stage 5 kidney failure due to blunt force trauma to the right postero lateral lower torso causing the kidney failure . . . as it caused CK to go from normal (28) into over-drive, while the CK-Enzyme released from muscles when traumatized, to over 5,000."  (Doc. 66 ¶ 67.)  Plaintiff does not cite any evidence for this assertion that he had stage 5 kidney failure due to blunt force trauma, and the medical records provided by Defendants do not support this conclusion.

in the left cephalic, which Dr. Suchak considered the likely cause of the pain and swelling in Plaintiff's left arm.   (Doc. 63 ¶¶ 68-69; Doc. 63-1 at 88-90.)   Plaintiff's treating physicians believed there was IV drug use at the site where Plaintiff's left arm was swelling, but Plaintiff has "never used a needle type injection to administer a drug into his system." (*Id.* ¶ 70; Doc. 66 ¶ 70.)   According to Plaintiff, the cause of the pain in Plaintiff's left arm, including the wrist, hand, and fingers, was from Defendant Strawser yanking Plaintiff off the floor and Defendant Garibay pulling Plaintiff's handcuffed arms upwards at the PCSO substation.   (Doc. 66 ¶ 69.)

Dr. Suchak discharged Plaintiff from the hospital on May 17 after his CK levels dropped below 5,000; the discharge diagnosis states "you were seen for muscle breakdown that caused kidney injury." (Doc. 63 ¶¶ 71-72.)   The discharge summary further stated:

> Patient was found to have positive screen for opiates and ampheatmines [sic] on initial evaluation and was found to have AKI [presumably, acute kidney injury] with rhabdomyolysis. Was admitted for further management of rhabdo with IVF. During hospital stay CK trended down slowly with IVF and AKI resolved over the course of several days.   Patient was monitored until CK was below 5000 and AKI had completely resolved.

> Patient was also noted to have significantly swollen left arm that was worked up several times due to intermittent worsening in hospital.   CT scans x 2 showed some mild edema without any abscess or fluid collection, US showed superficial venous thrombosis to the outside arm—with concerns of IV drug use at that site.   Patient was started on IV abx [antibiotics] for cellulitis and then de-escalated with improvement.   Arm was also iced and elevated with improvement in swelling.   On day of discharge patient able to use arm fully with minimal pain.

(Doc. 66-1 at 7.)

Three months later, Plaintiff was again admitted to Banner with an altered mental status, and the physician noted Plaintiff was "also found to be in rhabdomyolysis with hyperkalemia."[7]   (Doc. 63 ¶ 66; Doc. 63-1 at 101.)

_____

[7] Defendants assert that the treating physician thought the rhabdomyolysis was

Defendants' medical expert, Dr. Michael Stevens, reviewed Plaintiff's records and opined that "[t]o a reasonable degree of medical probability, Mr. Tillard's rhabdomyolysis and acute renal insufficiency were a direct result of his methamphetamine use." (Doc. 63 ¶ 78.)   Dr. Stevens asserts that "[t]he association of methamphetamine use and rhabdomyolysis is a well-known cause and effect in medicine.   In fact, Mr. Tillard presented with a milder manifestation of this same issue just a few months after the admission relating to the subject incident in May 2019, again, caused by methamphetamine use." (*Id.*)   Dr. Stevens attributes the pain and swelling in Plaintiff's arm to generalized rhabdomyolysis "or a focal exacerbation of it," and opines that, if events had occurred as Plaintiff described, he "would expect obvious focal visible signs of that trauma on the skin, not just pain and swelling that emerged hours after the first evaluation by the ED physician on May 11, 2019."   (*Id.*)   Plaintiff objects to all of Dr. Stevens' opinion statements, asserting that his past methamphetamine use has never caused any organ disfunction and there were visible signs of trauma on his wrist.   (Doc. 66 ¶¶ 77-78.)   Plaintiff provides photos of his left arm, wrist, and fingers that he says show edema and handcuff imprints. (*Id.* ¶ 75; Doc. 66-1 at 11-13.)   The two photos Plaintiff provides do appear to show swelling just below the elbow, but it is not clear if handcuff imprints are visible in the photos.   Whether these photos depict handcuff imprints is a question of fact that the Court must view in the light most favorable to Plaintiff at this stage.

## IV.   Fourth Amendment Legal Standard

A claim that law enforcement officers used excessive force during an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard.   *Graham v. Connor*, 490 U.S. 386, 395 (1989).   The Fourth Amendment does not prohibit the use of reasonable force.   *Tatum v. City & Cnty. of S.F.*, 441 F.3d 1090, 1095 (9th Cir. 2006). Whether the force was excessive depends on "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without

---

related to methamphetamine use (Doc. 63 ¶ 66, citing PCSO_TILLARD 1038-40), but the Court did not locate where the medical records cited by Defendants make this connection. (*See* Doc. 63-1 at 99-101.)

1    regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397; *Tatum*, 441

2    F.3d at 1095; *Lolli v. Cnty. of Orange*, 351 F.3d 410, 415 (9th Cir. 2003).  This inquiry

3    requires a "careful balancing of the nature and quality of the intrusion on the individual's

4    Fourth Amendment interest against the countervailing governmental interests."  *Id.*

5          To determine whether a Fourth Amendment violation has occurred, the court

6    conducts a three-step analysis, assessing (1) the nature of force inflicted; (2) the

7    governmental interests at stake, which involves assessing factors such as the severity of the

8    crime, the threat posed by the suspect, and whether the suspect was resisting arrest (the

9    "*Graham* factors"); and (3) whether the force used was necessary.  *Espinosa v. City &*

10   *Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at

11   396−97, and *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).  "Ultimately,

12   [courts] must balance the force that was used by the officers against the need for such force

13   to determine whether the force used was "greater than is reasonable under the

14   circumstances."  *Espinosa*, 598 F.3d at 537.

15         "The reasonableness of a particular use of force must be judged from the perspective

16   of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

17   *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20−22 (1968)).  This is

18   because "[t]he calculus of reasonableness must embody allowance for the fact that police

19   officers are often forced to make split-second judgments—in circumstances that are tense,

20   uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

21   situation."  *Graham*, 490 U.S. at 396−97.

22         At the summary judgment stage, once the court has "determined the relevant set of

23   facts and drawn all inferences in favor of the nonmoving party to the extent supportable by

24   the record," the question of whether or not an officer's actions were objectively reasonable

25   under the Fourth Amendment is a "pure question of law."  *Scott*, 550 U.S. at 381 n.8.  But

26   an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's

27   favor, could support a finding of excessive force.  *Smith v. City of Hemet*, 394 F.3d 689,

28   701 (9th Cir. 2005).  Because the excessive force balancing test is "inherently fact specific,

1   the determination whether the force used to effect an arrest was reasonable under the Fourth

2   Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of*

3   *San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted);

4   *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations,

5   and the excessive force inquiry "nearly always requires a jury to sift through disputed

6   factual contentions, and to draw inferences therefrom") (quotation omitted).

7   **V.    Discussion**

8          **A.    Defendant Garibay**

9                **1.    Causation**

10       Defendants primarily argue that Plaintiff's excessive force claim fails because

11   Plaintiff has not provided expert medical opinion to establish that Defendants' actions

12   caused either the left arm swelling or the rhabdomyolysis. (Doc. 62 at 8-13, citing

13   *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163-64 (9th Cir. 2005) (to prevail in a

14   § 1983 claim, a plaintiff must show that (1) acts by the defendants (2) under color of state

15   law (3) deprived him of federal rights, privileges, or immunities and (4) caused him

16   damage).) Defendants argue that the left arm swelling did not occur until approximately

17   nine- and a-half hours after Defendant Strawser arrested Plaintiff and approximately six

18   hours after Plaintiff was examined by AMR. (*Id*. at 11-12.) Defendants contend that the

19   hours-long delay in swelling is not the type of injury that may be considered by the jury

20   without the benefit of expert medical opinion. (*Id.* at 12, citing *Manriquez v. Town of*

21   *Superior*, CV 18-02025-PHX-DWL, 2020 WL 5544407, at *15 (D. Ariz. Sept. 16, 2020).)

22       Defendants' reliance on *Manriquez* is misplaced. In that case, the district court

23   noted that the defendants were relying on Arizona law to set forth what is required for

24   causation, but it was not clear whether Arizona law even governed causation in a § 1983

25   action. *Manriquez*, 2020 WL 5544407, at *15 (citing cases). The court further noted that

26   it is the function of the jury to determine "in any case in which it may reasonably differ on

27   the issue, whether the defendant's conduct has been a substantial factor in causing the harm

28   to the plaintiff," but that it is the court's role to determine "whether the evidence as to the

1    facts makes an issue upon which the jury may reasonably differ." *Id*. (quoting Restatement

2    (Second) of Torts § 434(2) and 434(a)(1)).   The court determined, in light of these

3    standards, that the plaintiff would not be allowed to argue at trial that the defendant's

4    conduct caused him to suffer a torn labrum or other long-term shoulder damage or to

5    introduce an MRI report to corroborate the existence of such injuries because the MRI was

6    taken 16 months after the plaintiff's encounter with the defendants, and because the

7    plaintiff had previously attributed his pain to an injury in high school and he had suffered

8    shoulder pain for years before his encounter with the defendants.  *Id*. at *16.

9         Unlike the evidence in *Manriquez*, the evidence here shows Plaintiff suffered pain,

10   difficulty breathing, and lost consciousness immediately after Plaintiff claims Garibay

11   assaulted him, for which an expert is not necessary.  In addition, Plaintiff suffered pain and

12   swelling to his arm and was diagnosed with rhabdomyolysis within hours of his encounters

13   with Defendants.  The fact that the swelling did not occur immediately after the alleged

14   assaults is not dispositive.  Moreover, the medical evidence in this case is not like the

15   months-old MRI evidence at issue in *Manriquez* or the evidence that the *Manriquez*

16   plaintiff had complained of shoulder pain and injury long before his encounter with the

17   defendants.   While Defendants' expert in this case, Dr. Stevens, opines that the

18   rhabdomyolysis was probably related to Plaintiff's drug use, there is no evidence from

19   Plaintiff's treating physicians or medical records that drug use was the cause, as opposed

20   to the alleged knee strike to Plaintiff's torso.  The fact that Plaintiff had another episode of

21   rhabdomyolysis three months later is also not dispositive because the medical record is not

22   clear about the cause of that second occurrence of rhabdomyolysis.

23        Based on this record, there is a question of fact whether Defendant Garibay's actions

24   caused the injuries Plaintiff suffered.  Defendants' medical expert only says that within a

25   "reasonable degree of medical probability, [Plaintiff's] rhabdomyolysis and acute renal

26   insufficiency were a direct result of his methamphetamine use."  Defendants' expert did

27   not treat Plaintiff and none of the medical records by Plaintiff's treating physicians

28   establish a cause for his rhabdomyolysis.   One treating physician documented a

"differential for etiology includes statin, methamphetamines," but that note did not exclude other possible causes for the acute rhabdomyolysis, such as external trauma.  Nor do Plaintiff's treating physicians establish a cause for the arm swelling, with only a mention of "concerns" about IV drug use, but Plaintiff denies ever using intravenous drugs.  Even if "IV drug use" could mean a hospital IV, this also does not resolve whether the swelling could have been caused by Defendants' actions.  Plaintiff presents evidence that when Defendant Garibay allegedly yanked his handcuffs upwards and kneed him in the side, he experienced severe pain and breathing difficulty, told Garibay he was hurting him and to please stop, and then lost consciousness, which alone is sufficient to create a question of fact that Garibay did cause injury to Plaintiff.

### 2. *Graham* Factors

Defendants do not address any of the *Graham* factors in their Motion or their Reply but rely almost exclusively on their causation analysis.  Defendants therefore appear to concede there are disputed issues of material fact as to Plaintiff's excessive force claim against Defendant Garibay, and the evidence presented supports this conclusion.

Accepting Plaintiff's facts as true for purposes of summary judgment, Garibay entered the holding cell where Plaintiff was seated, pulled Plaintiff up by the handcuffs high up into the air, and kneed him in the side with such force that Plaintiff was in severe pain, could barely breathe, and lost consciousness.  This is a significant level of force and whether such force was justified depends on the governmental interests at stake, including such factors as the crime at issue, the threat posed by Plaintiff, and whether Plaintiff was resisting.  Plaintiff was charged with assault/domestic violence, disorderly conduct, possession of dangerous drugs, and possession of marijuana, but by the time he encountered Defendant Garibay, Plaintiff was sitting in a holding cell and was handcuffed, Garibay entered the cell, said "domestic violence, huh," and proceeded to pull Plaintiff upwards by the handcuffs and kneed Plaintiff in the side.  Accepting this as true, there is no evidence Plaintiff posed any threat or was resisting Garibay in any way, and there was no need for any force.  While Defendant Garibay denies any use of force on Plaintiff, this

is a credibility dispute that cannot be resolved on summary judgment.  *See Anderson*, 477 U.S. at 249–50.

Based on this record, there are disputed issues of material fact whether Defendant Garibay used any force and, if so, whether that force was greater than was reasonable under the circumstances.

### 3.    Qualified Immunity

Defendants argue that Defendant Garibay is entitled to qualified immunity because no constitutional violation occurred, no reasonable juror could believe Plaintiff's version of events, and no clearly established law exists that Garibay's actions in simply escorting Plaintiff to a patrol vehicle for transport would violate Plaintiff's constitutional rights. (Doc. 62 at 16.)  Defendants argue in a footnote that although Plaintiff may believe he recalls being assaulted, "he was in a drug overdose state with altered mental status and self-described amnesia, which makes Plaintiff's memory suspect for the entire day on May 11, 2019."  (*Id*. at 9 n.7.)

Government officials are entitled to qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation.  *Pearson v. Callahan*, 555 U.S. 223, 230–32, 235–36 (2009) (courts may address either prong first depending on the circumstances in the particular case).  In the qualified immunity analysis, the court must consider all disputed facts in the light most favorable to the nonmovant.  *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017).

For a right to be clearly established there does not have to be a case directly on point; however, "existing precedent must have placed the statutory or constitutional question beyond debate."  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2017)).  Clearly established law "must be particularized to the facts

of the case," and "should not be defined at a high level of generality." *White*, 137 S. Ct. at 552 (quotation and citation omitted).  A right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 137 S. Ct. at 551).

Once the right at issue is defined, the court must then "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated" that right.  *Id.*  If there is no such case, then the right was not clearly established.  *See id.* at 1117–18.  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted).  "The Supreme Court has made clear that 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Mattos v. Aragon*, 661 F.3d 433, 442 (9th Cir. 2011) (quoting *Hope*, 536 U.S. at 741).  This principle is particularly relevant "in the context of Fourth Amendment cases, where the constitutional standard—reasonableness—is always a very fact-specific inquiry." *Id.*; *see Drummond v. City of Anaheim*, 343 F.3d 1052, 62 (9th Cir. 2003) (holding that "no federal case directly on point [was needed] to establish" that the conduct at issue violated clearly established law and constituted excessive force).

The Court has already determined there is a question of fact regarding whether Defendant Garibay violated Plaintiff's Fourth Amendment rights.  The Court's analysis therefore centers on whether that right was clearly established at the time of Garibay's alleged use of excessive force.

Neither Plaintiff nor Defendants attempt to define the right at issue and neither party cites cases in support of their respective positions.  The Court finds the right at issue in this case is the right of an arrestee who is sitting handcuffed in a holding cell and is not threatening or resisting officers to be free from being yanked up by the handcuff chain and

then kneed in the torso.  This summary of the right at issue uses the nonmoving party's version of the facts, which the Court must do on summary judgment.  *See Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("[w]here the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the nonmoving party, summary judgment is not appropriate").

The Ninth Circuit has long held that "where there is no need for force, *any* force used is constitutionally unreasonable." *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000), *vacated and remanded on other grounds*, *Cnty. of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001).  In 2003, in *Drummond*, the Ninth Circuit found that the "officers' use of severe force was constitutionally excessive" in light of the fact that the force was used when the plaintiff was "handcuffed and lying on the ground," and the officers were not entitled to qualified immunity.  343 F.3d at 1059; *see also Motley v. Parks*, 432 F.3d 1072, 1088 (9th Cir. 2005) ("[t]he use of force against a person who is helpless or has been subdued is constitutionally prohibited"), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012); *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001) ("[g]ratuitous and completely unnecessary acts of violence by the police during a seizure violate the Fourth Amendment"); *P.B. v. Koch*, 96 F.3d 1298, 1303-04 & n.4 (9th Cir. 1996) ("since there was no need for force, [the defendant's] use of force was objectively unreasonable"); *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007) (officers not entitled to qualified immunity because the state of the law put the officers on notice that "punching [the plaintiff] to free his arms when, in fact, he was not manipulating his arms in an attempt to avoid being handcuffed," violated the Fourth Amendment).

Considering this precedent, Defendant Garibay was on notice that pulling a handcuffed person upwards by the handcuffs and kneeing him in the side, when that person was not threatening the officer, resisting, or causing any provocation, would violate the Fourth Amendment.  Defendant Garibay is not entitled to qualified immunity.

**B.    Defendant Strawser**

Defendants argue that Plaintiff cannot establish that Defendant Strawser caused him harm and even if he could, the alleged force used was de minimis, which does not rise to the level of a constitutional violation.  (Doc. 62 at 8-15.)

Strawser states in her Declaration that after she placed Plaintiff under arrest, she and Deputy Waggoner "assisted [Plaintiff] from his current prone position up to his knees and then to his feet."  (Doc. 63-1 at 46 ¶¶ 9-10.)  Strawser denies ever grabbing the handcuffs around Plaintiff's wrist and yanking his arms upwards, and that "it would have been almost assuredly impossible for me to yank [Plaintiff] up into the air by just pulling on the handcuffs given the large physical discrepancies between the two of us."  (*Id.* ¶ 11.)  Strawser asserts that after getting Plaintiff to his feet, he did not complain of any pain or make any statements about how the officers assisted him up from the ground.  (*Id.* ¶ 12.)

Plaintiff states in his Declaration that Strawser grabbed the link chain of his handcuffs and pulled him "somewhat off of the ground, and the Plaintiff jack-knifed into the leg of [ ] Strawser.  Then the Plaintiff using his own remedy got up to his feet."  (Doc. 66-1 at 37.)  Plaintiff does not say how far up or for how long Strawser pulled on the handcuffs, he does not say he suffered any pain from Strawser's action or that he told her to stop, and he does not explain what he means by "jackknifed."  Plaintiff's evidence against Strawser is simply too vague and conclusory to create a triable issue of fact that Strawser caused him harm or used more than de minimis force.  *See, e.g., Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) ("a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact") (citation omitted); *Graham*, 490 U.S. at 396 ("not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers', violates the Fourth Amendment") (internal citation and quotations omitted)

Plaintiff also states in his Complaint that Defendant Strawser's technique was "not proper departmental procedure," and in his Response states that Strawser "did not use a standard proce[]dure, taught by all law enforcement training camps the true & correct

protocol to get Plaintiff up to his feet as he was laying flat on his stomach handcuffed behind his back." (Doc. 1 at 5; Doc. 65 at 8.)  Even assuming Strawser used an incorrect procedure, the failure to follow a departmental procedure is not necessarily a constitutional violation.  *See e.g., Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009) (failure to follow departmental regulations does not establish a constitutional violation).

Based on this record, a reasonable jury could not find Strawser caused Plaintiff any harm or used more than de minimis force, and the Court will grant summary judgment to Defendant Strawser and dismiss her from this action.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 62).

(2)     Defendants' Motion for Summary Judgment (Doc. 62) is **granted in part** as to Defendant Strawser and **denied in part** as to Defendant Garibay.

(3)     Defendant Strawser is **dismissed** from this action with prejudice.

(4)     This matter is referred to Magistrate Judge John Z. Boyle (selected by random draw) for a settlement conference on the remaining claim against Defendant Garibay.

(5)     Defense Counsel shall arrange for the relevant parties to jointly call Magistrate Judge Boyle's chambers at (602) 322-7670 within 14 days to schedule a date for the settlement conference.

Dated this 25th day of January, 2022.

James A. Teilborg
Senior United States District Judge